# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

Eric E.,[1]

      **Plaintiff,**

v.                                  **Civil Action No. 2:21-cv-398**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Eric E. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") under the Social Security Act. Specifically, Plaintiff cites four errors. First, he claims that the Administrative Law Judge ("ALJ") failed to find that Plaintiff's impairments met or equaled a medical listing. Plaintiff also alleges that the ALJ did not properly consider the medical opinions of record, particularly those from his treating physician, and that the ALJ erred in formulating Plaintiff's residual functional capacity ("RFC") by failing to perform a function-by-function analysis. Lastly, he argues that the ALJ improperly discredited his subjective complaints of pain. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

## I.    PROCEDURAL BACKGROUND

On September 7, 2018, Plaintiff initially filed for DIB.  (R. 20).  Plaintiff alleged disability beginning November 4, 2011, id., based on left knee injury, lower back injury, and blood clots, (R. 270).   The state agency denied his application initially and on reconsideration.  (R. 20). Plaintiff then requested an administrative hearing.  Id.  The hearing was held via telephone on August 12, 2020. Id.  Counsel represented Plaintiff at the hearing, and a vocational expert ("VE") testified. Id.  At the hearing, Plaintiff amended his alleged onset date to December 6, 2016. Id.

On August 21, 2020, the ALJ denied Plaintiff's claim for DIB, finding he was not disabled during the period alleged.  (R. 29).  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 23).  On May 19, 2021, the Appeals Council denied Plaintiff's request for review.  (R. 1).

On July 16, 2021, Plaintiff filed his complaint in this court. Compl. (ECF No. 1).  Plaintiff seeks judicial review of the Commissioner's final decision that he was not entitled to an award of DIB, claiming that "[t]he decision of the Commissioner is legally erroneous and without substantial evidence to support it in the record considered as a whole." Id. ¶ 7 (ECF No. 1, at 2). On December 8, 2021, Plaintiff moved for summary judgment.  (ECF No. 18).  Plaintiff argues that the case should be reversed or remanded because the ALJ failed to properly (1) analyze whether Plaintiff's impairments met or equaled a listing; (2) weigh medical opinion evidence; (3) perform a function-by-function analysis; and (4) consider Plaintiff's subjective complaints. Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 19, at 14).   On January 7, 2022, the Commissioner opposed Plaintiff's motion and moved for summary judgment. (ECF No. 20). The Commissioner argues that (1) substantial evidence supports the ALJ's finding that Plaintiff's

impairments did not meet a listing; (2) the ALJ properly considered the medical opinions of record pursuant to the applicable regulations; (3) substantial evidence supports the ALJ's RFC finding; and (4) the ALJ was not required to take Plaintiff's subjective complaints at face value. Def.'s Mem. Supp. Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 21, at 14, 22, 26, 29). Plaintiff replied. ("Pl.'s Reply") (ECF No. 22). After a review of the record, this Report considers each of these arguments.

## II.    FACTUAL BACKGROUND

Plaintiff was born on August 28, 1966, and on the date last insured, he was 51 years old. (R. 27). Plaintiff met the insured status requirements under the Social Security Act until December 31, 2017. (R. 22). He has not engaged in substantial gainful activity since December 6, 2016, the alleged onset date. Id. He has a high school education, (R. 28), and he has reported past work as a yard jockey and material handler, (R. 27).

### A.    Medical Treatment

In 2011, Plaintiff was involved in a head-on vehicle collision while working as a yard jockey, which involves transporting tractor-trailers between docking stations, wind stations, and empty lots.[2] (R. 47-48, 1140). He received related left knee surgeries—for a patella fracture and tendon repairs—in 2011 and 2012. (R. 1140). The collision also caused Plaintiff to experience chronic low back pain for several years before the relevant timeframe. (R. 752, 1799).

Plaintiff's arguments in this court do not require a review of his medical history generally, only a review of that medical history concerning his asserted impairments relevant to the

---

[2] In his brief, Plaintiff cited to various medical summaries prepared by state agency opinions, see, e.g., (R. 96-98), and provider summaries, see, e.g., (R. 814-21). The court has attempted to identify the correlated record cites.

timeframe between his alleged onset, December 6, 2016, and his date last insured, December 31, 2017. (R. 20).

### 1.    Leg and Knee Impairments

In January 2013, Antonio J. DiStasio II, M.D., noted that Plaintiff was fit for sedentary duties only because of his chronic left knee extensor mechanism weakness. (R. 1629). In April 2014, Plaintiff reported experiencing numbness and tingling radiating from his left knee to his toes. (R. 1635). Dr. DiStasio continued the imposed restrictions and assessed Plaintiff with lower extremity chronic extensor insufficiency. Id.

In June 2016, Plaintiff's providers noted that he suffered from a chronic displaced comminuted fracture of the right patella and chronic left knee pain. (R. 1456, 1677). In August, Plaintiff reported that the pain in his left knee was "constant, variable, dull, and aching." (R. 1002). He said the discomfort increased with walking, weight-bearing activities, and prolonged sitting. Id. In October 2016, Dr. DiStasio performed another surgical patella tendon repair. (R. 497, 511-12). At a follow-up appointment, Dr. DiStasio recommended Plaintiff engage in sedentary work only, required Plaintiff to use a knee brace, and referred Plaintiff for physical therapy. (R. 1696).

On December 6, 2016, approximately two months after surgery, David Scott Ramstad, M.D., at an appointment related to his bilateral deep vein thrombosis ("DVT"),[3] observed that Plaintiff arrived walking with crutches, but also assessed Plaintiff with a normal gait and stance. (R. 1485). The following week, after being diagnosed with bilateral DVT, Lloyd Shabazz, M.D., recorded that Plaintiff was wearing a brace on his left leg and knee and walking with crutches. (R. 544-45). On December 15, 2016, Dr. DiStasio found that Plaintiff could discontinue using his

_____

[3] Thrombosis is a "clotting within a blood vessel which may cause infarction of tissues supplied by the vessel." Thrombosis, Stedman's Medical Dictionary (27th ed. 2000). See infra.

brace but should continue protected weightbearing and resume physical therapy.  (R. 1166).
Plaintiff continued physical therapy through April 2017.  (R. 925-95).  Physical therapy notes
reflect Plaintiff's use of a straight cane.  See, e.g., (R. 925, 931).

In January 2017, Dr. DiStasio observed that Plaintiff was ambulating with a cane.  (R.
1163).  He assessed Plaintiff's condition as improved but noted that Plaintiff took narcotics for the
pain.  Id.  X-rays showed that left knee hardware was intact with appropriate patellar height.  (R.
1165).  Plaintiff had an active range of motion from 10 degrees to 95 degrees, and a passive range
of motion from 0 degrees to 100 degrees.  Id.  Later that month, Plaintiff told Dr. Ramstad that he
was "doing beter [sic] overall," (R. 2112), and Dr. Ramstad recorded that Plaintiff's gait was
abnormal and he walked with a cane, (R. 2114).

On February 9, 2017, Plaintiff "report[ed] overall improvement" with some knee pain.  (R.
950).  Plaintiff told Dr. DiStasio that his knee would "'give out' on him if he walk[ed] too far." Id.
He reported using a cane "for community ambulation," but did not generally use the cane at home.
Id.  The following week, Dr. DiStasio removed the cerclage wire from Plaintiff's knee.  (R. 1136).

In March, Dr. DiStasio noted that Plaintiff had extensor lag, left quadricep atrophy, left
lower extremity swelling, and lower back pain aggravated by his gait abnormality.  (R. 1161).
Plaintiff complained of mild knee pain and stiffness that was worse at night, and he continued to
take narcotics for the pain.  Id.  However, Plaintiff's gait was "much improved."  (R. 1162).

In May, Dr. DiStasio noted Plaintiff had discontinued physical therapy because of his back
pain.  (R. 1159).  Plaintiff's gain was "much improved," and his left knee had full active range of
motion.  (R. 1160).  On July 13, Dr. DiStasio referred Plaintiff to physical therapy again to address
Plaintiff's closed displaced comminuted fracture of his right patella, his recurrent left knee
instability, and the non-traumatic rupture of his left patellar tendon.  (R. 1815).

On July 26, Dr. Ramstad noted that Plaintiff's gait and stance were normal. (R. 2110). The next day, Bryan Fox, M.D., recorded that Plaintiff experienced left leg numbness with prolonged sitting or standing. (R. 752).

### 2.   Spinal Cord Impairments

In 2015, Dr. DiStasio ordered magnetic resonance imaging ("MRI") performed on Plaintiff's back. (R. 1219, 1644). Dr. DiStasio assessed Plaintiff with degenerative disc and joint disease (L4-5, L5-S1), exacerbated by gait abnormality; foraminal and mild central stenosis (L4-5, L5-S1); and left sciatica. (R. 1219). Plaintiff was referred to Brian Fox, M.D. (R. 1644).

Dr. Fox managed Plaintiff's pain from August to October 2016.[4] (R. 274). Plaintiff represented that he had delayed back treatment while waiting for worker's compensation approval. (R. 1002). He reported non-radiating pain in the left-mid and left-lower lumbar spine. Id. Plaintiff failed to respond to three months of conservative management, and on October 3, 2016, Plaintiff received a sacroiliac joint injection on the left side. (R. 1000). Plaintiff reacted positively to the injection, but Dr. Fox could not administer lumbar epidural steroid injections while Plaintiff remained on certain medication. (R. 752, 998).

On July 27, 2017, Plaintiff reported to Dr. Fox that his primary complaint was "isolated pain in the lower lumbar spine on the left side." (R. 752). However, Plaintiff reported that his back pain was "not terrible at the moment" and quoted 3/10 pain. Id. He stated that the prior injection gave him little-to-no relief, but Dr. Fox noted that Plaintiff had previously indicated about 40% relief. Id. Plaintiff's functional level allowed him to live independently and remember details. Id. Dr. Fox ordered a new MRI to assess disc pathology nerve compression. (R. 754).

---

[4] Some of Dr. Fox's exams appear to have been conducted by Eileen Scott, P.A., and then co-signed by Dr. Fox. See, e.g., (R. 750).

The August 2017 MRI showed left central disc protrusion at L5-S1 moderately narrowing the left lateral recess contacting the nerve roots—similar to Plaintiff's 2015 MRI—as well as mild degenerative changes to L4-L5 with no high-grade stenosis. (R. 1798-99). Later that month, Dr. Fox noted that Plaintiff's MRI showed moderate left-sided stenosis at L5-S1 and mild bilateral stenosis at L4. (R. 750). Plaintiff's neurological exam showed that his limbs were sensate. Id. Dr. Fox found that Plaintiff's symptoms could be consistent with a lumbar radiculopathy and scheduled him for an epidural injection. (R. 751).

On August 31, 2017, Dr. Fox administered the first injection. (R. 746). Plaintiff reported that this injection helped and provided about 40% improvement. (R. 742). Dr. Fox provided a second injection on October 12, 2017. (R. 739, 909). At the appointment, Plaintiff reported that his back pain interfered with his functional abilities. (R. 739). In November, Plaintiff reported that the second injection made the pain more tolerable for a few days, but the pain was still present. (R. 735). Dr. Fox observed that there was no tenderness to palpitation, (R. 736), but that Plaintiff had received "little benefit" from the injections, and the pain "appear[ed] to be centered around the sacroiliac joint," (R. 737). Plaintiff's neurological exam was normal. (R. 736). Dr. Fox referred Plaintiff to Michael Ingraham, M.D., and ordered a functional capacity evaluation. (R. 737).

Dr. Ingraham evaluated Plaintiff's low back pain on November 30, 2017. (R. 731). Plaintiff reported that the injections provided only one or two days of relief, with the second injection providing none. Id. Dr. Ingraham thought Plaintiff could benefit from further diagnostic workup, and he prescribed Cymbalta and recommended use of a lidocaine gel or patch. (R. 733).

In March 2018, difficulties with Plaintiff's worker's compensation provider restricted Dr. Ingraham's treatment, but he assessed Plaintiff with lower back pain, sacroiliitis, and lumber

radiculopathy.  (R. 725-26).  Dr. Ramstad recorded Plaintiff's back pain as ongoing into January 2019.  (R. 2096, 2104).

### 3.   Deep Vein Thrombosis with Pulmonary Emboli

Plaintiff first developed DVT in 2012 following his earlier knee surgeries.  (R. 545, 1275, 1595).  He experienced DVT again following his October 2016 surgery.  See (R. 545).

On November 22, 2016, Plaintiff presented to Sentara Hospital with complaints of constipation and generalized abdomen pain.  (R. 1173).  He presented again the next day and was diagnosed with left lung pneumonia.  (R. 1168).  Plaintiff "continued to feel lousy" and visited his primary care physician, who referred him for testing.  (R. 553).  A chest computerized tomography scan showed pulmonary emboli ("PE"), id., and Doppler imaging showed DVT in the right extremity (common femoral vein) and left extremity (mid femoral vein), (R. 558-59).  Dr. DiStasio opined that the DVT could be related to Plaintiff's sedentary status post-surgery.  (R. 1168).  Plaintiff was prescribed Eliquis.  (R. 543, 558).

Because of Plaintiff's multiple DVTs, Plaintiff was referred to Dr. Shabazz to determine whether he had a genetically inherited protein abnormality predisposing him to risk of DVT.  (R. 543).  At the first appointment on December 12, Plaintiff had bilateral swelling in the lower extremities from DVT.  (R. 544).  Dr. Shabazz ordered a complete thrombophilic evaluation, (R. 545), which came back with an abnormal factor V Leiden, (R. 542).  Because Plaintiff had a genetically inherited thrombophilia, he was at increased risk of DVT and PE and would need to remain on anticoagulation therapy indefinitely.  Id.

Because of insurance company coverage, Plaintiff switched from Eliquis to Xarelto.  (R. 536, 539).  His physical examination was "unremarkable" in February, (R. 540-41), and May, (R. 537).  In July, Dr. Shabazz ordered a chest x-ray and doppler of Plaintiff's bilateral lower

extremities. (R. 535).  The August testing showed no evidence of DVT in the right leg, but chronic nonocclusive DVT in the mid-femoral, distal femoral, and popliteal vein segment of the left leg. (R. 518-19).  Dr. Shabazz interpreted the testing as "reveal[ing] a chronic DVT in the left mid femoral vein," but no acute DVTs.  (R. 530).  Dr. Shabazz ordered bloodwork and a CT scan to assess Plaintiff's PE.  Id.  The September CT scan showed no current PE and that previous embolic filling defects had resolved.  (R. 516-17).

In December 2017, at a follow-up appointment, Dr. Shabazz confirmed that recent testing showed chronic DVT in Plaintiff's left leg, but no acute DVTs, and no PE.  (R. 527).  Plaintiff's physical exam was unremarkable.  Id.  Dr. Shabazz reminded Plaintiff he would have to remain on anticoagulation medication because of his thrombophilic disorder.  Id.

Dr. Ramstad listed DVT and PE as continuing medical problems in January 2019.  (R. 2097).  Plaintiff later switched from Dr. Shabazz to Dr. Dahmle, who kept him on anti-coagulants. (R. 1467).

## B.  Opinion Testimony

### 1.  Dr. Wardell

On June 6, 2018, Plaintiff visited Anthony W. Wardell, M.D., for an independent medical evaluation.[5]  (R. 1140); see also (R. 2075).  Dr. Wardell reviewed Plaintiff's medical records.  (R. 1140-41).  The physical examination showed that Plaintiff's left thigh circumference was diminished, the left knee range of motion was 0 to 120 degrees, and there was tenderness.  (R. 1142).  Dr. Wardell expressed the following opinion:

---

[5] Plaintiff represents that Dr. Wardell was a treating source.  Pl.'s Mem. (ECF No. 19, at 26); see also (R. 1140, 2075).  Dr. Wardell saw Plaintiff "for evaluation of injuries sustained" from the 2011 motor vehicle collision.  (R. 1140).  Plaintiff has not directed the court to any treating records other than the independent medical evaluation performed in June 2018.

> [Plaintiff] is totally disabled.  He has no significant current work capacity.  He requires chronic anti-coagulation with Xarelto which will be lifetime.  He will require ongoing treatment, preferably at a pain management center for injection therapy and medication therapy as needed.  Upon flare-ups he will require physical therapy.

Id.

### 2.      Southeastern Physical Therapy

In September 2017, Jeffrey Hartline, MPT (Southeastern Physical Therapy), reported that

Plaintiff had reached maximum medical improvement ("MMI") and assigned him a 24% left lower

extremity impairment.  (R. 1822).  The physical therapist observed the following:

> [Plaintiff] is independent with ADL's, selfcare and driving.  He ambulates with a limp, and uses a cane 100% of the time.  He scores 26/60 on the [Lower Extremity Functional Scale].  His [range of motion] measures full extension and 110 degrees of flexion.  His strength is 4/5.  Functionally he has difficulty squatting, kneeling, walking quickly.

Id.  The following month, Dr. DiStasio adopted that 24% impairment rating.  (R. 776, 778).

On December 5, 2017, Plaintiff completed a questionnaire, referred to as a Functional

Capacity Evaluation ("FCE"),[6] while at Southeastern Physical Therapy.  (R. 1743-56).  Plaintiff

indicated that his pain prevented him from standing for more than 10 minutes, sitting for longer

than 15 minutes, or traveling for longer than 30 minutes.  (R. 1746-47).  He stated that pain

restricted his social life, and that he could not walk without a stick or crutches.  (R. 1747).  Sheldon

Cohn, M.D., noted that this FCE "reportedly" found Plaintiff "clear for sedentary type work," but

Dr. Cohn did not review the FCE.  (R. 2074).

Later that month, MPT Hartline assessed Plaintiff with a back impairment of 3%.  (R.

1755).

---

[6] See infra note 13.

### 3.     State Agency Opinions

At the initial stage of agency review, Daniel Camden, M.D., opined that Plaintiff was not disabled.  (R. 89).  Dr. Camden found that "[t]he evidence in file [was] not sufficient to fully evaluate" Plaintiff's claim, and the necessary evidence could not be obtained.  Id.

At the reconsideration stage, Wyatt S. Beazley, III, M.D., assigned Plaintiff a "light" physical RFC.  (R. 102).  He found that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  (R. 100).  Dr. Beazley opined that Plaintiff could stand or walk for 6 hours and sit for 6 hours in an 8-hour workday, and he was limited in his left lower extremities.  Id.  Dr. Beazley found that Plaintiff had postural limitations, including that he could frequently balance; could never climb ladders/ropes/scaffolds or crawl; and could only occasionally climb ramps/stairs, stoop, or kneel.  (R. 100-01).

### C.    Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on August 12, 2020.  (R. 36).  The ALJ also heard testimony from the VE, Brian Bierley.  Id.

### 1.     Plaintiff's Testimony

Plaintiff testified that, before Thanksgiving 2017, he lived in a one-story home with his wife and children.  (R. 45-46, 64).  His family then moved to a two-story home.  (R. 64).  While he testified that he slept "most of the time downstairs," he kept his personal effects (e.g., clothes, toothbrush) upstairs and was "basically living upstairs."  (R. 65).  He represented that there was a first-floor bedroom in the house, but his son slept there.  (R. 66).  Plaintiff had a handicap placard and driver's license, and he drove "[s]ome distances."  (R. 46).

Plaintiff testified that his back pain got worse in 2017, (R. 62-63), but he was not in pain management, (R. 67).  Plaintiff described his leg stiffening and swelling up while he was "out and

about" and that he needed a "cane there . . . to help [him] lean on." Id.   He acknowledged that the cane was not prescribed.   Id.   He testified that he was taking his wife's Hydrocodone medication "basically every day," but she had passed away, and he had not obtained his own prescription. (R. 68-69).  Plaintiff testified that he elevates his leg "as much as possible" to alleviate the swelling. (R. 71-72).

### 2.      Testimony from the VE

In his testimony, the VE characterized Plaintiff's prior yard jockey work as semi-skilled medium work, and material handler as semi-skilled heavy work, with composite job of heavy. (R. 75). The ALJ's hypothetical for the VE posited a person with the same age, education, and work experience as Plaintiff could perform "light" work with the following maximum capabilities:

> He could frequently, but not always balance.  He could only occasionally climb stairs, stoop, kneel, and crouch.  He should never climb ladders or crawl.  He could frequently, but not always, have exposure to extreme wetness and humidity.  He could frequently, but not always have exposure to vibration.  No more than occasional exposure to fumes, gases, or pulmonary irritants. He should have no exposure to workplace hazards such as unprotected heights and dangerous machinery.  He could frequently, but not always twist the lumbar spine, that is the lower back.  He would be limited to standing or walking up to only four hours total in an eight-hour work day, so this is a limited light. . . . [A]lso limit him to non-production paced tasks as to tempo and capacity.

(R. 75-76). The VE testified that Plaintiff could not perform past relevant work. (R. 76).  The VE testified that jobs would be available to such a person, identifying information clerk (DOT 237.367-018) with 41,000 jobs nationally; order caller (DOT 209.667-014), with 33,000 jobs nationally; and ticket seller (DOT 211.467-022) with 19,000 jobs nationally.  Id.

The ALJ further restricted the hypothetical to sedentary, which eliminated the need for standing or walking for more than four hours.  (R. 76-77).  He also asked whether Plaintiff's transferrable skills would allow Plaintiff to transition to a new job.  (R. 77-78).  The VE testified

that there would not be any jobs in this scenario. (R. 78). The VE also testified that more than fifteen percent of time off-task would eliminate all jobs available in the national economy. Id.

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

Plaintiff's brief identifies four errors in the ALJ's decision that he claims warrant remand. He contends that the ALJ's findings are unsupported by substantial evidence because the ALJ allegedly failed to find that Plaintiff's impairment met a listing, to properly weigh medical opinion evidence, to perform a function-by-function analysis, or to consider Plaintiff's subjective complaints of pain.   As explained below, this Report finds no error in the ALJ's analysis. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

### A.   Framework for SSA Disability Evaluation

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)).   As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 1382c(a)(3)(A)); accord 20 C.F.R. § 416.905(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4).   Specifically, the regulations direct the ALJ to answer the following five questions:

1.      Is the individual involved in substantial gainful activity?

14

2.      Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.      Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.      Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.      Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.      The ALJ Decision Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from his alleged disability onset date until the hearing date. (R. 22). At step two, the ALJ found that

15

Plaintiff suffered from the following severe impairments: knee dysfunction, obesity, degenerative disc disease, and chronic venous insufficiency. Id. At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 23). The ALJ developed a finding regarding Plaintiff's RFC. (R. 24). He determined Plaintiff was able

> to perform light work as defined in 20 [C.F.R. §] 404.1567(b) except: The claimant could frequently but not always balance. He could occasionally climb stairs, stoop, kneel, and crouch. The claimant could never climb ladders or crawl. He could have no more than frequent exposure to extreme wetness and humidity. The claimant could have no more than frequent exposure to vibration. He could have no more than occasional exposure to fumes, gases or pulmonary irritants. The claimant could have no exposure to workplace hazards such as unprotected heights/dangerous machinery. He could frequently but not always twist the lumbar spine or lower back. The claimant was capable of standing or walking up to 4 hours in total in an 8-hour workday. He could perform only nonproduction-paced tasks as to tempo and capacity.

(R. 24). At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work. (R. 27). He found that transferrable skills were not material to the disability determination because a finding of not disabled was supported regardless. (R. 28). The ALJ found that significant jobs existed in the national economy. Id. At step five, the ALJ ultimately found that Plaintiff was not disabled. (R. 29).

**C.    The ALJ Did Not Err in Determining Whether Plaintiff's Impairments Met or Equaled a Listed Impairment.**

Plaintiff argues that his impairments should have met or equaled a listed impairment. Pl.'s Mem. (ECF No. 19, at 17). Listings of Impairments ("Listings") are regulatory descriptions "of physical and mental impairments which, if met, are conclusive on the issue of disability." Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). These listings are found in 20 C.F.R. Part 404, Subpart P, Appendix 1, which defines impairments "in terms of several specific medical signs, symptoms, or laboratory test

results" that are severe enough to prevent a claimant from being unable to engage in any gainful activity. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); see also id. at 532 ("[P]urpose of listings is to describe impairments 'severe enough to prevent a person from doing any gainful activity[.]'" (quoting 20 C.F.R. § 416.925(a)); SSR 83-19, 1983 WL 31248, at *1 (Jan. 1, 1983) (listings define "medical conditions which ordinarily prevent an individual from engaging in any gainful activity")). Listings are therefore more stringent than proving disability under steps four and five. Zebley, 493 U.S. at 532 ("[T]he medical criteria defining the listed impairments [are] at a higher level of severity than the statutory standard.").

A claimant is entitled to this conclusive presumption of impairment "if he can show that his condition meets or equals the listed impairments." Radford, 734 F.3d at 291 (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)) (cleaned up); see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."). To meet the requirements of a Listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530 (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)). Plaintiff claims that he meets Listing 1.02A and Listing 1.04A, as well as that the combination of his impairments should equal a Listing. Pl.'s Mem. (ECF No. 19, at 17, 19, 21-22). The ALJ's determination that Plaintiff's impairments did not meet or equal a Listing is supported by substantial evidence. (R. 23).

### i.    Listing 1.02A: Involvement of Major Peripheral Weight-Bearing Joint

Plaintiff asserts that he "has a gross anatomical deformity involving a major peripheral weight bearing joint." Pl.'s Mem. (ECF No. 19, at 19). Listing 1.02A[7] addresses the major dysfunction of a joint:

> Characterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
>> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively . . . .

20 C.F.R. pt. 404, Subpart P., App. 1, § 1.02 (West 2021). The ALJ found that Plaintiff did not meet Listing 1.02A because he had not "established that he is unable to ambulate effectively . . . ." (R. 23). In this case, the ALJ's opinion provides a sufficient factual basis to support his conclusion that Plaintiff's impairments did not meet or equal Listing 1.02A.

Substantial evidence supports the ALJ's finding that Plaintiff can ambulate effectively. See § 1.02(A). Ineffective ambulation requires "an extreme limitation" on walking, which means "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." § 1.00(B)(2)(b)(1) (emphasis added). An example of ineffective ambulation includes "the inability to walk without the use of a walker, two crutches or two canes . . . ." § 1.00(B)(2)(b)(2). Plaintiff argues that because he "did not have a steady gait" and "needed to use a cane," he met the Listing criteria. Pl.'s Mem. (ECF No. 19, at 20). However, Plaintiff ordinarily used a single cane, (R. 67, 925, 950, 2114), which does not meet the Listing's examples of "two canes" or an assistive device

---

[7] Listing 1.02A was effective until April 1, 2021. See 20 C.F.R. Pt. 404, Subpart P., App. 1, § 1.02 (West 2021). Because the relevant timeframe for Plaintiff's claim was December 6, 2016, to December 31, 2017, the Listing still applies. (R. 20).

limiting "<u>both</u> upper extremities," § 1.00(B)(2)(b)(1)-(2) (emphasis added). Courts have generally found that "use of a cane alone is insufficient to meet [Listing 1.02A.]" <u>Masha v. Astrue</u>, No. 3:10CV248, 2010 WL 6802749, at *6 (E.D. Va. Nov. 19, 2010); <u>see also Jones v. Berryhill</u>, 681 F. App'x 252, 255 (4th Cir. 2017) (finding that claimant's "occasional use of a single cane does not qualify as 'inability to ambulate effectively' which . . . is defined by regulation to require two-handed assistance with walking").

Plaintiff argues that "his use of a cane was approved by a medical provider" and was "credited" when assessing his functional capacity.[8] Pl.'s Mem. (ECF No. 19, at 20). However, as the ALJ observed, "there is no indication of [any] prescription of a cane." (R. 23). Plaintiff has acknowledged that his cane was not prescribed. (R. 67). Throughout the medical records, Plaintiff's providers merely observed that Plaintiff used a cane. <u>See, e.g.</u>, (R. 1163) ("He presents today ambulating with a cane."); (R. 2114) (describing gait as "[a]bnormal walks with a cane"). Plaintiff told Dr. DiStasio that he used his "cane for community ambulation, but generally [did] not use it at home." (R. 950). He testified that he "sometimes" used the cane, describing how his leg would stiffen while he was "out and about," causing him to "lean on" the cane. (R. 67). Plaintiff's inconsistent use of a single, non-prescribed cane is not sufficiently restrictive to meet the Listing.

Additional evidence available to the ALJ also supports Plaintiff's ability to ambulate. The ALJ noted that Plaintiff's gait was occasionally described as normal. (R. 23). In fact, Plaintiff's primary care physician noted in December 2016 that he "walk[ed] with a crutches [sic]" but found

---

[8] It is unclear from briefing what Plaintiff intends to characterize as a functional capacity evaluation. At various times, Plaintiff references a functional capacity evaluation performed outside the relevant timeframe. Pl.'s Mem. (ECF No. 19, at 28) (citing R. 817-18) (referencing 2012 evaluation). However, as the only clearly referenced record from within the timeframe is a left lower impairment rating, (R. 1822), the analysis considers this record.

his gait and stance to be normal. (R. 1485). The regulations provide other examples of ineffective ambulation, such as "the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." § 1.00(B)(2)(b)(2). Plaintiff keeps his personal effects in a second-floor bedroom—despite the home having a bedroom on the first floor—which appears to require daily stair use. (R. 65-66). He has a driver's license and drives "[s]ome distances." (R. 46). He ambulates around the community, using his cane to "lean on" when necessary. (R. 67). Substantial evidence thus supports the ALJ's findings that Plaintiff could ambulate effectively.

Plaintiff also claims that the ALJ did not "adequately explain his rationale" in finding the Listing unsatisfied. Pl.'s Mem. (ECF No. 19, at 20). In analyzing whether a Listing is met, the ALJ is generally required to "clearly set forth the reasons for his decision." Diaz v. Comm'r SSA, 577 F.3d 500, 504 (3d Cir. 2009) (citing Burnett v. Comm'r SSA, 220 F.3d 112, 119 (3d Cir. 2000)). This includes identifying the applicable Listing and comparing the claimant's symptoms to the criteria of the Listing. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986); see also Russell v. Chater, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. 1995) (unpublished table opinion) (noting that the ALJ is not held to "an inflexible rule requiring an exhaustive point-by-point discussion in all cases" (discussing Cook v. Heckler)). Plaintiff criticizes the ALJ for citing only one medical exhibit.[9] Pl.'s Mem. (ECF No. 19, at 20). However, the ALJ's rationale is discernable

---

[9] The ALJ reviewed Exhibit 13F in finding that Plaintiff did not meet Listing 1.02A, (R. 23), which is 188 pages of medical records, (R. 1620-1737). Plaintiff also states that the "ALJ had medical records dating back to 2011, more than ten years," implying that the ALJ should have cited ten years' worth of medical records. Pl.'s Mem. (ECF No. 19, at 20). As Defendant argues, "records from 2011 were irrelevant" to Plaintiff's disability during the relevant timeframe. Def.'s Opp'n (ECF No. 21, at 18). The ALJ only decided whether Plaintiff was disabled from December 6, 2016, to December 31, 2017. (R. 20). Evidence outside this period is irrelevant unless it bears on Plaintiff's condition during the relevant time period. See Rose v. Astrue, No. 2:09CV00030, 2010 WL 1528541, at *3 (W.D. Va. Apr. 15, 2010) ("[T]he court's inquiry is limited to the evidence from the pertinent time period."); see also Bird v. Comm'r SSA, 699 F.3d 337, 345 (4th Cir. 2012) (requiring "retrospective consideration to medical evidence created after a

from his explanation and is capable of meaningful judicial review. See (R. 23). The ALJ was not required to further elaborate when he "provide[d] a coherent basis for his step-three determination." Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018); see also id. (holding that the ALJ is not required to "provide an exhaustive point-by-point breakdown of each and every listed impairment.").

### ii.    Listing 1.04: Nerve Root or Spinal Cord

Plaintiff asserts that the ALJ failed to explain why Plaintiff's nerve and spinal impairments did not meet Listing 1.04A. Pl.'s Mem. (ECF No. 19, at 22-24). Listing 1.04A[10] addresses the disorders of the spine:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

§ 1.04(A) (West 2021). The ALJ found that Plaintiff did not meet Listing 1.04A because there was no evidence of nerve compression with additional symptoms. (R. 23-24). The ALJ's opinion provides a sufficient factual basis to support this conclusion.

---

claimant's last insured date when such evidence may be 'reflective of a possible earlier and progressive degeneration'" (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969))), superseded by statute on other grounds; Hill v. Colvin, No. DKC 15-1027, 2016 WL 3181762, at *10 (D. Md. June 8, 2016) ("The ALJ may consider evidence outside the disability period that is probative, however."), R. & R. adopted by 2016 WL 4269094 (Aug. 15, 2016).

[10] Listing 1.04A was effective until April 1, 2021. See 20 C.F.R. Pt. 404, Subpart P., App. 1, § 1.04 (West 2021). Because the relevant timeframe for Plaintiff's claim was December 6, 2016, to December 31, 2017, the Listing still applies. (R. 20).

Substantial evidence supports the ALJ's finding that Listing 1.04A was not satisfied. Specifically, while Plaintiff can show "left central disc protrusion at L5-S1 moderately narrowing contacting the left S1 nerve roots," as the ALJ observed, (R. 24), he cannot show evidence of nerve root compression. The ALJ noted that "[i]maging did not show nerve root impingement . . . ." Id. Further, Listing 1.04A requires all of the symptoms of nerve root compression, including (1) neuro-anatomic distribution of pain; (2) spinal motion limitation; (3) muscle weakness or atrophy with sensory or reflex loss; and (4) positive straight-leg raising test. § 1.04(A). The ALJ cited evidence that Plaintiff "had normal gait and negative straight leg raise," and his "use of a cane was not prescribed." (R. 24). The ALJ thus identified specific record evidence disqualifying Plaintiff from meeting Listing 1.04A.

Plaintiff relies on the functional report reflecting his use of cane, but—as discussed above—a single cane is not sufficiently restrictive. Cf. § 1.00(2)(a) ("Regardless of the causes of the musculoskeletal impairment, functional loss . . . is defined as the inability to ambulate effectively on a sustained basis"). Defendant identifies additional evidence that Plaintiff has failed to allege, including the straight-leg test, muscle atrophy, and motor or reflex loss. Def.'s Opp'n (ECF No. 21, at 21-22). Plaintiff was required to allege each of these to meet his burden of satisfying the Listing.[11] See Henderson v. Colvin, 643 F. App'x 273, 276 (4th Cir. 2016) (noting that the plaintiff did not produce evidence of atrophy and had no significant evidence of muscle weakness).

Additional evidence before the ALJ also supports his finding that the Listing (and specifically the requisite symptoms) were unmet. Exams found that Plaintiff's motor and sensory examinations were normal. (R. 736) ("no gross deficits"); (R. 750) ("limbs sensate"); see also (R.

---

[11] It is not the court's role under the current standard to comb the record in support of these elements.

1165) ("Motor and sensory intact."). Plaintiff delayed back treatment significantly while waiting for worker's compensation approval, (R. 1002), and delayed injections while on certain medication, (R. 752, 998). Plaintiff's functional level also permitted him to live independently in a second-floor bedroom. See (R. 65-66, 752). Substantial evidence thus supports the ALJ's findings that Plaintiff did not meet the criteria of Listing 1.04A.

Lastly, the Fourth Circuit's holding in Radford v. Colvin, 734 F.3d 288 (4th Cir. 2013), is not particularly instructive here. Plaintiff cites Radford's holding that claimants "need not show that each symptom was present at precisely the same time" or "that the symptoms were present in the claimant in particularly close proximity." Pl.'s Mem. (ECF No. 19, at 23) (quoting Radford, 734 F.3d at 294). However, the ALJ cited this same holding in the text of his opinion, indicating that he fully considered this argument. (R. 23) (observing that Radford did "not require that all of the medical criteria of [Listing] 1.04A appear simultaneously or in particularly close proximity"). Further, the Fourth Circuit remanded Radford because the ALJ's conclusion was "devoid of reasoning." Radford, 734 F.3d at 295 (noting that the ALJ "summarily concluded" that no Listing was met). As outlined above, the ALJ here provided an explanation sufficient to allow meaningful judicial review, and Radford does not change the analysis.

### iii.    Combination of Impairments

Plaintiff further implies that his combined impairments should equal a Listing. Pl.'s Mem. (ECF No. 19, at 17, 21-22). In determining equivalency, the Commissioner can find that an impairment is "medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). This provision allows the ALJ to find that a specific Listing is met by either analogizing symptoms or allowing alternative symptoms to complete a gap in severity. See § 416.926(b) (outlining three ways medical

equivalence can be satisfied).     Plaintiff argues that the ALJ "failed to address whether the combination of the Plaintiff's joint dysfunction combined with the [DVT]" equals a Listing. Pl.'s Mem. (ECF No. 19, at 22).  Plaintiff has not met his burden to demonstrate that his impairments combine to satisfy a Listing.

First, Plaintiff's argument fails because—as Defendant argues—Plaintiff did not identify which Listing his joint dysfunction and DVT allegedly equal in combination.  Def.'s Opp'n (ECF No. 21, at 18).  The law requires that the plaintiff identify a specific Listing.  Adkins v. Colvin, No. 3:14-27920, 2016 WL 854106, at *9 (S.D. W. Va. Feb. 11, 2016) (noting plaintiff "fail[ed] to identify which Listing the ALJ did not consider"), R. & R. adopted by 2016 WL 868342 (Mar. 4, 2016).   In Robertson v. Kijakazi, the court denied a claimant's appeal when he listed his impairments and "abruptly concluded that 'it is obvious' that he 'meets the listing for disability,'" but did not "identify any listing that his combination of impairments purportedly meets or medically equals . . . ."  No. 3:20-cv-00538, 2021 WL 3611044, at *11 (S.D. W. Va. July 28, 2021), R. & R. adopted by 2021 WL 3610471 (Aug. 13, 2021).  Plaintiff here similarly listed Dr. Wardell's opinion regarding Plaintiff's impairments in detail, but then simply concluded that the DVT with the joint dysfunction "relate significantly to at least" a Listing. Pl.'s Mem. (ECF No. 19, at 22).  This is insufficient.  Listings are regulatory devices requiring the ALJ to compare specific symptoms with specific Listing criteria—which requires that a Listing be identified.  See § 416.926(b), (e)(3).

Furthermore, the ALJ stated that he considered whether Plaintiff's combination of impairments would equal a Listing.  (R. 23) (finding Plaintiff did not have a "combination of impairments" that equaled a Listing).  This statement is entitled to some deference.  Cf. Reid v. Comm'r Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (stating that the reviewing court should take

an ALJ's "word" that he considered the entire record, "absent evidence to the contrary") (citing Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[T]ak[ing] a lower tribunal at its word when it declares that it has considered a matter.")). The ALJ also discussed two Listings in addition to Listing 1.02A and 1.04A (specifically Listings 7.08 and 4.11). (R. 24). It thus appears that the ALJ adequately considered whether Plaintiff's combination of impairments satisfied a Listing, and his opinion is supported by substantial evidence.

### D.   The ALJ's Assessment of Plaintiff's RFC is Supported by Substantial Evidence Because the ALJ Appropriately Considered the Persuasiveness of the Medical Opinion Evidence.

Plaintiff argues that the ALJ should have granted his providers' opinions controlling weight as treating physicians, but this is incorrect. Pl.'s Mem. (ECF No. 19, at 25). The Fourth Circuit previously applied a "treating physician rule," which gave treating physicians controlling weight, but that rule is outdated. See § 404.1527(c)(2). On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff filed his claim on September 7, 2018, (R. 20), the new rules apply.[12] Defendant correctly argues that under three key aspects of the new regulatory framework—that is, what constitutes a medical opinion, whether deference is appropriate, and whether persuasiveness was considered—Plaintiff's argument that the ALJ should have consider the contested opinions differently must fail. See Def.'s Opp'n (ECF No. 21, at 23-24). Each is discussed below.

---

[12] Plaintiff continued applying the old rule in his reply brief even after Defendant pointed out Plaintiff's error. See Pl.'s Reply (ECF No. 22, at 3); see also Def.'s Opp'n (ECF No. 21, at 22).

1.    **Plaintiff's Treatment Providers Did Not Give Medical Opinions.**

The new regulations narrowly constrain what constitutes a medical opinion, defining it as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" regarding certain abilities.  § 404.1513(a)(2); see also Def.'s Opp'n (ECF No. 21, at 23-24).  Plaintiff references three potential opinions that he argues should have been granted additional weight: Dr. Wardell, Dr. DiStasio, and the FCE.  Pl.'s Mem. (ECF No. 19, at 29).  These are not medical opinions under the new rules.

i.    **Dr. Wardell**

Dr. Wardell's treatment record is not a medical opinion under the new regulations because he offered no opinion on specific restrictions, instead opining on a topic reserved to the Commissioner.  The ALJ is not required to "provide any analysis about how" he or she considered evidence that is "inherently neither valuable nor persuasive."  § 404.1520b(c).  Inherently invaluable evidence includes evidence on issues reserved to the Commissioner—including statements of disability.  § 404.1520b(c)(3)(i).  Dr. Wardell's opinion clearly falls within this prohibition because he simply opined that Plaintiff was "totally disabled" and without "significant current work capacity."  (R. 1142).  This is the crux of his opinion.  And it is upon this irrelevant opinion that Plaintiff largely relies.  See Pl.'s Mem. (ECF No. 19, at 29).  Thus, the ALJ was not required to consider Dr. Wardell's opinion.

Dr. Wardell did not opine on any other factors requiring analysis.  See (R. 1142).  Medical opinions require the physician to opine about work ability, specifically a claimant's ability to perform physical and mental demands, to utilize required senses (e.g., hearing), or to adapt to environmental conditions.  § 404.1513(a)(2).  Dr. Wardell issued only a conclusory statement that

Plaintiff was disabled, without analyzing how Plaintiff's underlying impairments would impact his ability to perform specific work-related tasks. See (R. 1142). He then merely summarized the types of ongoing treatments Plaintiff would require, such as anti-coagulation medication, injection therapy, and physical therapy. Id. These are opinions dealing with prognosis, not work ability, and do not constitute medical opinions under the regulations. See § 404.1513(a)(3); see also Pl.'s Mem. (ECF No. 19, at 29) (referencing Dr. Wardell's "permanent prognosis"). Therefore, the ALJ did not err by not discussing Dr. Wardell's record—which was apparently produced in connection with his worker's compensation claim and not as the result of a treating relationship. See (R. 1140).

> ### ii.     Dr. DiStasio

Dr. DiStasio's treatment records do not constitute medical opinions because, as Defendant argues, "statements . . . reflecting judgments about a claimant's diagnosis and prognosis . . . do not necessarily provide perspectives about the claimant's functional abilities and limitations." Def.'s Opp'n (ECF No. 21, at 25) (citing §§ 404.1513(a)(2), (3)). As discussed regarding Dr. Wardell above, medical opinions require the physician to opine about work ability. § 404.1513(a)(2). Plaintiff has not identified which of Dr. DiStasio's medical records discuss his ability to work within the relevant timeframe. See Pl.'s Mem. (ECF No. 19, at 28-29). Furthermore, Plaintiff's chronicle of impairments since 2011, as detailed in his brief, fails to indicate that Dr. DiStasio's treatment required opinions beyond prognosis or diagnosis. See id at 26-28. Therefore, because Dr. DiStasio's records do not constitute medical opinions within the regulations, the ALJ's omission does not require remand.

### iii.    Functional Capacity Evaluation

None of Plaintiff's FCEs constituted medical opinions under the regulations.[13]  Plaintiff himself completed much of the December 2017 questionnaire, see (R. 1746-49), and Dr. Cohn did not review it when noting that Plaintiff was fit for sedentary work, (R. 2074).  It therefore cannot constitute a physician's opinion about work ability.  See § 404.1513(a)(2).  With the assignment of Plaintiff's knee impairments, MPT Hartline found that Plaintiff had difficulty with certain movements (e.g., squatting), and assigned an impairment rating for his lower left extremity of 24%.  (R. 1822).  This is an opinion about prognosis, and it does not address Plaintiff's capacity "to perform . . . demands of work activities" or "adapt to environmental conditions," as required for a medical opinion.  § 404.1513(a)(2).  Thus, the ALJ had no need to evaluate its persuasiveness. Yet, while the ALJ did not discuss the persuasiveness of the 24% impairment rating (and was not required to do so), the ALJ discussed the rating itself—on the same page of the opinion where he finds that "the medical evidence of record supports that the claimant would be limited to a reduced range of work." (R. 26).  The ALJ considered any FCEs appropriately.

### 2.    Deference to Treating Physicians Is No Longer the Prevailing Legal Standard.

Second, under the new regulations, an ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," which includes records from Plaintiff's treating physicians.  § 404.1520c(a); see also Def.'s Opp'n (ECF No. 21, at 24). Plaintiff does not discuss this new rule in his briefing, instead relying on the old treating physician

---

[13] It is unclear from briefing what Plaintiff intends to characterize as an FCE.  At various times, Plaintiff references an FCE performed far outside the relevant timeframe.  Pl.'s Mem. (ECF No. 19, at 28) (citing R. 817-18) (summarizing 2012 evaluation).  He also refers to the FCE questionnaire performed in December 2017, id. at 12, as well as Southeastern Physical Therapy's assignment of impairment ratings, id. at 20.  The Commissioner responds primarily to Southeastern Physical Therapy's assignment of a 24% rating for Plaintiff's knee impairments.  See Def.'s Opp'n (ECF No. 21, at 21).

rule, which entitled treating physicians to substantial deference. Pl.'s Mem. (ECF No. 19, at 24-26); Pl.'s Reply (ECF No. 22, at 3). While this rule was "robust," as Plaintiff argues, id. at 25, it has been entirely supplanted by the new regulations, § 404.1520c. Therefore, the ALJ did not err by not granting Dr. Wardell and others controlling weight.

### 3.   The ALJ Must Only Describe the Persuasiveness of Medical Opinions, Not Accord Opinions Specific Weight.

Lastly, medical opinions are no longer granted specific weight, but the ALJ instead considers the "persuasiveness" of the records. 20 C.F.R. § 404.1520c(a); see also Def.'s Opp'n (ECF No. 21, at 24). The ALJ is only required to explain the most important factors of "supportability" and "consistency." § 404.1520c(b)(2). Plaintiff argues that the ALJ failed by not "assign[ing] any evidentiary weight to the medical opinions in the record" and thus his opinion cannot be supported by substantial evidence. Pl.'s Reply (ECF No. 22, at 3); see also Pl.'s Mem. (ECF No. 19, at 16) (noting "decision is devoid of mention of the weight of these opinions"). However, the ALJ adequately discussed the persuasiveness of the medical opinions and prior administrative medical findings, which is all that was required under the new rules. (R. 27).

As discussed above, the only opinions here that constitute "medical opinions" under the new regulations are those given by the state agency medical experts who reviewed Plaintiff's file. See § 404.1513(a)(2). These experts—particularly Dr. Beazley—offered opinions on certain work-related limitations. See (R. 100-01) (rating Plaintiff's exertional and postural limitations); see also (R. 89) (finding insufficient evidence to evaluate claim). The ALJ reviewed these opinions, noting that he found it "generally persuasive" that Plaintiff "was limited to work at the light exertional level" with certain restrictions. (R. 27). He also considered supportability and consistency when he found that "based on the updated medical evidence of record [Plaintiff] would require greater limitations" than those the medical experts imposed, and limited Plaintiff to four

hours of standing and walking in an eight-hour workday. Id.; see also § 404.1520c(b)(2). Thus, the ALJ appropriately evaluated the opinion evidence in the record.

**E.     The RFC Is Supported by Substantial Evidence.**

Plaintiff's next argument is that the ALJ erred under Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), by "not determining his RFC using a function-by-function analysis." Pl.'s Mem. (ECF No. 19, at 29). Plaintiff specifically alleges that certain medical evidence was unconsidered, and that the hypotheticals posed to the VE did not include all of Plaintiff's functional limitations. Id. at 31. However, as the Commissioner argues, the ALJ satisfied the Fourth Circuit's requirements by discussing the all the relevant evidence and fully accounting for Plaintiff's functional limitations. Def.'s Opp'n (ECF No. 21, at 27).

In Mascio, the Fourth Circuit held that the ALJ's RFC "assessment must . . . identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Mascio, 780 F.3d at 636 (quoting Social Security Ruling 96-8p, 1996 WL 374184 (July 2, 1996)) (alteration in original). Additionally, the Fourth Circuit noted that "the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . .'" Id. (quoting Social Security Ruling 96-8p). When the ALJ does not perform an explicit function-by-function analysis, "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."[14] Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

---

[14] Plaintiff is challenging the ALJ's discussion of his physical impairments, not mental impairments. The facts of Mascio involved mental impairments, and the ALJ had impermissibly accounted for limitations in

However, the Fourth Circuit "rejected a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." Id. at 636 ("We agree that a per se rule is inappropriate . . . ."). In the absence of an explicit function-by-function analysis, "the court must assess whether the ALJ's RFC analysis considered the relevant functions, whether his decision provides a sufficient basis to review his conclusions, and, ultimately, whether that decision is supported by substantial evidence in the record." Ashby v. Colvin, No. 2:14-674, 2015 WL 1481625, at *3 (S.D. W. Va. Mar. 31, 2015). In these cases, the court examines the ALJ's decision to see whether the proper analysis was conducted and there is "a substantive discussion of [the ALJ's] rationale." Id. at *4. Plaintiff identifies three areas where he claims the ALJ's narrative discussion was insufficient: Plaintiff's use of cane, his edema, and his need to elevate his legs.[15] Pl.'s Mem. (ECF No. 19, at 31). The ALJ's narrative discussion of the evidence in this case is sufficient to satisfy Mascio and Social Security Ruling 96-8p. See (R. 24-27) (addressing Plaintiff's allegations of disability and analyzing the evidence).

The ALJ's analysis of Plaintiff's cane use is sufficiently clear under Mascio. As discussed above, Plaintiff presented to his physicians throughout the relevant timeframe using a single cane. See, e.g., (R. 1163, 2114). The ALJ included this in his narrative discussion of the evidence, observing that Plaintiff "use[d] a cane that [was] not prescribed but doctor told him to use as needed," and finding that the record gave "no indication that this was necessary and [Plaintiff] had largely normal gait and negative straight leg raise." (R. 25) (noting the medical evidence did "not

---

concentration, persistence, and pace by restricting the hypothetical to simple, unskilled work. Mascio, 780 F.3d at 638.

[15] In addition to these three, Plaintiff also argues that "the ALJ failed to assess" Dr. Wardell's opinion, summarizing Dr. Wardell's medical findings in detail. Pl.'s Mem. (ECF No. 19, at 30-31). The ALJ was not required to discuss this evidence, see supra, and this appeal is not an opportunity to relitigate the evidence, see infra.

support the degree of limitation alleged by the claimant"). The ALJ analyzed Plaintiff's functional ability, reviewing certain medical findings that, as a whole, did "not support greater limitations prior to the date last insured." (R. 27); see also (R. 26-27) ("The record does not support the requirement of a cane to stand and ambulate."). The ALJ thus thoroughly analyzed Plaintiff's cane usage, and his explanation contains "sufficient basis to review his conclusions" as required under Mascio.  Ashby, 2015 WL 1481625, at *3; see also Mascio, 780 F.3d at 636-37 (requiring "analysis" to allow the court "to review meaningfully [the ALJ's] conclusions).

The ALJ also provided sufficient analysis when discussing Plaintiff's edema and leg-raising. First, he included Plaintiff's edema in his narrative discussion of the evidence, observing that Plaintiff "noted swelling in the left leg and he sits and elevates his leg." (R. 25). However, he found that "the medical evidence of record does not include . . . allegations [of edema] nor the presence of edema." Id. Plaintiff has not pointed the court to any conflicting medical evidence. Thus, the ALJ's analysis of these issues is sufficient.

However, even more importantly, the ALJ's RFC as a whole is supported by substantial evidence. The ALJ crafted the RFC with Plaintiff's knee limitations in mind, stating that Plaintiff's "knee impairment also has been taken into account when limiting [his] ability to stand/walk to 4 hours in an 8 hour workday." (R. 26). The ALJ reviewed specific medical evidence in conjunction with his analysis, including that Plaintiff's gait was reported as normal, he had no tenderness to palpitation, and he experienced improvement with treatment. (R. 27). Plaintiff was able to ambulate effectively, as analyzed above. See supra. Further, in January 2017, Plaintiff told Dr. Ramstad that he was "doing beter [sic] overall." (R. 2112); see also (R. 950) (reporting "overall improvement"). Plaintiff generally did not use a cane at home. (R. 950). Plaintiff's physical therapist found that Plaintiff was "independent with ADL's, selfcare and driving." (R. 1822).

Also, while Plaintiff remained on anti-coagulants for his genetic predisposition toward DVT, (R. 542), testing showed that any acute DVTs and PEs had resolved, (R. 516-17, 527). While Plaintiff did have some swelling from DVT in December 2016, (R. 544), his physical examination was "unremarkable" in February 2017, (R. 540-41), and May 2017, (R. 537). Therefore, substantial evidence supports the ALJ's determination that Plaintiff was subject to some limitation but not fully disabled.

Plaintiff also alleges that the hypothetical posed to the VE may not have included all his functional limitations, which he characterizes as stemming from the ALJ's faulty analysis. Pl.'s Mem. (ECF No. 19, at 31). The Fourth Circuit requires that a helpful VE opinion "be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)). However, because there was no error in the ALJ's consideration of the evidence, this argument fails.

## F.   The ALJ Appropriately Considered Plaintiff's Subjective Complaints.

Plaintiff's final argument is that the ALJ did not appropriately evaluate his subjective complaints of pain. Pl.'s Mem. (ECF No. 19, at 31). The Commissioner argues that "[n]othing in the regulations or Fourth Circuit case law . . . requires an ALJ to accept a plaintiff's subjective complaints of pain at face value." Def.'s Opp'n (ECF No. 21, at 29) (citing Craig, 76 F.3d at 591). The ALJ appropriately weighed the subjective evidence in this case.

The regulations require the ALJ to "consider all of the available evidence from [a claimant's] medical sources and nonmedical sources," with objective medical evidence providing "a useful indicator" of how pain affects claimant's work ability. §§ 404.1529(c)(1), (2). But an ALJ also cannot reject a claimant's testimony about pain "solely because the available objective medical evidence does not substantiate [his or her] statements." § 404.1529(c)(2). However, as

33

explained below, this does not mean that the ALJ must rely on subjective testimony that is contradicted by objective medical evidence.

Plaintiff relies on Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006), and related caselaw to argue that he can rely entirely on subjective evidence. Pl.'s Mem. (ECF No. 19, at 33). Hines held that, after showing objectively that a condition could cause pain, a plaintiff is "entitled to rely exclusively on subjective evidence to prove . . . that his pain is so continuous and/or so severe that it prevents him from working a full eight hour day." Hines, 453 F.3d at 565. However, the Hines court specifically footnoted this holding with a quotation from an earlier Fourth Circuit case, Craig v. Chater, indicating that "[w]hile objective evidence is not mandatory . . . ,

> [t]his is not to say . . . that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

Id. at 565 n.3 (quoting Craig, 76 F.3d at 595) (emphasis added). Hines is distinguishable because here, unlike in Hines, the ALJ discussed objective medical evidence that discredited Plaintiff's subjective complaints of pain. Cf. id. at 566 (using Plaintiff's daily activities to discredit his subjective statements of pain). The ALJ summarized Plaintiff's allegations of pain, but determined that his statements "concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 25). The ALJ's opinion—which is read as a whole—discusses these inconsistencies. (R. 24-27); see also Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011).

Plaintiff identifies certain evidence that he argues the ALJ "failed to take into consideration," and states that this evidence "is an objective indicator which is not required when

assessing [Plaintiff's] subjective complaints of pain." Pl.'s Mem. (ECF No. 19, at 33-34). However, the standard of review is important. The court must defer to the ALJ's findings if those findings are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 868. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court must defer to the ALJ. Craig, 76 F.3d at 589. Because, as detailed above, the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

## V.      **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 20), DENY Plaintiff's Motion for Summary Judgment (ECF No. 18), and AFFIRM the Commissioner's finding of no disability.

## VI.      **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn,</u> 474 U.S. 140 (1985); <u>Carr v. Hutto,</u> 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce,</u> 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 11, 2022

36